IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS A. NICKELBERRY,<br><br>                    Petitioner,<br><br>          vs.<br><br>J. SOTO, Warden, California State Prison,<br>Los Angeles County,[1]<br><br>                    Respondent. | No. 2:14-cv-01168-JKS<br><br>MEMORANDUM DECISION |

        Marcus A. Nickelberry, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Nickelberry is in the custody of

the California Department of Corrections and Rehabilitation and incarcerated at California State

Prison, Los Angeles County.  Respondent has answered, and Nickelberry has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

        On March 18, 2010, Nickelberry was charged with two counts of robbery (counts 1 and

2), one count of possession of a short-barreled shotgun (count 3), one count of possession of a

firearm by a felon (count 4), and one count of receiving stolen property (count 5).  The

information alleged that he personally used a firearm during the commission of the robbery

counts and that he had suffered one prior strike conviction.  Shortly thereafter, Nickelberry was

arraigned and pled not guilty to the charges.

---

        [1]        J. Soto, Warden, California State Prison, Los Angeles County, is substituted for
the People of the State of California.  FED. R. CIV. P. 25(c); Rule 2(a), Rules Governing Section
2254 Cases in the United States District Courts; *Stanley v. Cal. Supreme Court*, 21 F.3d 359, 360
(9th Cir. 1994).

On direct appeal of his conviction, the California Court of Appeal recounted the

following facts underlying the charges against Nickelberry:

> On the morning of December 6, 2009, [Nickelberry], who was armed with a
> shotgun, approached a customer leaving a pizza restaurant in Vallejo, and demanded all
> the customer's money.  The customer pushed on [Nickelberry's] weapon so that it would
> remain pointed down, backed up toward a building, tripped, and fell down.  His cell
> phone fell out of his pocket, and [Nickelberry] took the phone.  [Nickelberry] then
> entered the pizza restaurant, pushed the shotgun into a restaurant employee, and
> demanded money.  The employee recognized [Nickelberry] as the same person who had
> earlier asked for a free pizza, and had hung around the restaurant for about 15 minutes,
> stating that he was waiting for his cousin.  The employee gave [Nickelberry] money from
> the restaurant's cash register, totaling between $120 and $150.
> [Nickelberry] fled the restaurant, got into a gray/silver truck, and fled to a Vallejo
> home that he occasionally visited.  Police searched the home and found a brown briefcase
> belonging to [Nickelberry] that contained a sawed-off shotgun, later identified as the one
> used during the robbery.  Police also recovered the cell phone taken from the pizza
> restaurant customer.

*People v. Nickelberry*, No. A130014, 2012 WL 1427376, at *1 (Cal. Ct. App. Apr. 25, 2012).

On April 27, 2010, the trial court held a hearing on pre-trial motions, including a motion

filed by Nickelberry's counsel to strike the prior conviction pursuant to *People v. Superior Court

(Romero)*, 917 P.2d 628 (Cal. 1996),[2] and Nickelberry's oral *Marsden*[3] motion to substitute

counsel.  With respect to the *Marsden* motion, the court closed the courtroom and engaged in a

---

[2]     Under California Penal Law § 1385, a California court may dismiss a defendant's
"strike" conviction for purposes of sentencing under the state's Three Strikes law; a motion for
such dismissal is referred to as a "*Romero*" motion based on the state supreme court's decision in
that case.  *Romero*, 917 P.2d at 632.  A trial court's failure to dismiss or strike a prior conviction
is reviewed for abuse of discretion.  *People v. Carmony*, 92 P.3d 369, 374 (Cal. 2004).  "[A] trial
court does not abuse its discretion unless its decision is so irrational or arbitrary that no
reasonable person could agree with it."  *Id*. at 377.

[3]     *People v. Marsden*, 465 P.2d 44 (Cal. 1970) (holding it was error for the trial
court to deny a defendant's motion to relieve his court-appointed attorney without holding a
hearing to allow the defendant to explain its grounds).

lengthy discussion with Nickelberry as to his complaints about counsel's performance and elicited responses from counsel.  The court denied both motions.

On June 28, 2010, Nickelberry filed a written *Marsden* motion alleging that counsel failed to: 1) communicate with him; 2) perform adequate investigation; 3) prepare and present an affirmative defense; 4) secure expert witnesses; 5) prepare and file motions; 6) impeach prosecution witnesses; 7) present evidence at motion hearings; and 8) declare prejudice due to his alleged role as a surrogate prosecutor against Nickelberry's interests.  That same day, the court denied the motion as untimely.

Two days later, a different trial judge heard Nickelberry's renewed *Marsden* motion in a closed courtroom.  That judge also allowed Nickelberry to explain at length his reasons for seeking new counsel.  At the conclusion of the hearing, the court denied the motion on the merits.  Nickelberry indicated that he did not wish to file a *Faretta*[4] motion to dismiss counsel and represent himself.

On July 1, 2010, Nickelberry proceeded to jury trial.  The following day, the jury found Nickelberry guilty of counts 1 through 4 and found true the fire enhancement allegation.  Immediately thereafter, the bifurcated prior conviction allegation was tried to the court, and the court found the allegation true.  The court subsequently sentenced Nickelberry to an aggregate term of 26 years and 4 months in state prison.

Through counsel, Nickelberry appealed his conviction, arguing that: 1) trial counsel was ineffective for failing to move to suppress items seized from the home where he was found;

---

[4]    *Faretta v. California*, 422 U.S. 806 (1975) (holding that a defendant in a state criminal trial has the constitutional right to refuse appointed counsel and represent himself when he does so voluntarily and intelligently).

2) trial counsel was also ineffective for not moving to suppress evidence seized from his truck;

3) trial counsel was likewise ineffective for failing to move to exclude a one-on-one show-up

identification; 4) trial counsel failed to meaningfully cross-examine prosecution witnesses;

5) trial counsel delivered a constitutionally-ineffective closing argument; 6) the trial court erred

in denying his motions to substitute counsel; 7) the trial court erred by denying him a

continuance to retain private counsel; 8) the court erred by admitting as an exhibit a photograph

of his truck; 9) the prosecutor committed misconduct by eliciting testimony about Nickelberry's

unemployment; 10) the prosecutor engaged in misconduct by attempting to lessen the

prosecution's burden of proof and eliminate the presumption of innocence; 11) the prosecutor's

closing argument regarding Nickelberry's connection to the truck constituted misconduct;

12) his conviction should be reversed due to cumulative error; and 13) his imposed sentence

violates the prohibition against cruel and unusual punishment.

 The Court of Appeal affirmed the judgment of conviction in an unpublished, reasoned

opinion issued on April 25, 2012. *Nickelberry*, 2012 WL 1427376, at *19.  Counsel for

Nickelberry petitioned for review in the California Supreme Court, raising his *Marsden* and

prosecutorial misconduct claims.  The Supreme Court denied the petition without comment on

July 25, 2012.

 On June 12, 2012, Nickelberry filed in the California Supreme Court a counseled petition

for a writ of habeas corpus.  The petition raised the remaining claims he unsuccessfully raised

before the Court of Appeal—ineffective assistance of counsel, evidentiary error, error in denying

a continuance, and cumulative error—and reasserted to the Supreme Court his claims that the

trial court erred in denying his *Marsden* motions and the prosecutor committed misconduct.  The California Supreme Court summarily denied the petition on July 25, 2012.

Nickelberry timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on May 1, 2013.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Nickelberry raises the 13 claims that he unsuccessfully raised on direct appeal, namely that: counsel rendered ineffective assistance (claims 1 through 5); the trial court erred in denying his motions to substitute counsel (claim 6) and for a continuance (claim 7) and in admitting an exhibit that lacked foundation (claim 8); the prosecutor committed misconduct (claim 9 through 11); his conviction should be reversed due to cumulative error (claim 12); and his sentence constitutes cruel and unusual punishment (claim 13).

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).

Nickelberry has not replied to Respondent's answer.  The relevant statute provides that

"[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show

cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the

extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also*

*Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no

evidence offered to contradict the allegations of the return, the court must accept those

allegations as true.  *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.       Ineffective Assistance of Counsel (Claims 1 through 5)

Nickelberry first claims that his trial counsel rendered constitutionally-inadequate

assistance in a number of respects.

1.       *Strickland Standard on Habeas Review*

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a

defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one

in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a

reasonable probability that the outcome might have been different as a result of a legal error, the

defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376,

1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at

7

393-95.  Thus, Nickelberry must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

> In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:
> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

2.      *Failure to Suppress Tangible Evidence (Claims 1 and 2)*

Nickelberry claims that defense counsel should have filed motions to suppress evidence found at both the house where he was apprehended and in his truck.  In considering this claim on direct appeal, the Court of Appeal laid out the following facts:

> At the preliminary hearing, a police officer testified that he received a description of the vehicle in which the robbery suspect fled, and he located a vehicle matching that description parked in the neighborhood.  A resident near where the vehicle was parked

8

told the officer that the vehicle's owner had entered a nearby house.  The officer requested additional units, set up a perimeter around the house, and called the occupants out of the house using an intercom system.  A woman described by the officer as "[t]he actual homeowner, an elderly black female" (Jennifer Banks) came out of the house, and told the officer that [Nickelberry] was still in the home.  Banks also told the officer that [Nickelberry] had arrived at her home 15 minutes before she spoke to police, and that he was carrying a brown briefcase when he arrived.

The officer testified that "[a]fter [Nickelberry] came out [of the house], we then continued to announce and then we were confident that, um, there was potentially no one else in the house, we went in and searched the house for additional suspects; cleared the house."  He further testified that, following the issuance of a search warrant, the officer searched a brown briefcase identified by Ms. Banks as belonging to [Nickelberry], and found a sawed-off shotgun inside that matched the description of the weapon used during the robbery.

On cross-examination, defense counsel asked, "When you went into the house the first time, was that done by the permission of Ms. Banks?"  The officer answered, "Yes, it was."

. . . .

Witnesses told the police officer who responded to the pizza restaurant that the suspect had fled in a silver, older model Ford pickup truck.  The officer searched the neighborhood and found a vehicle matching that description.  The license plate did not belong to the vehicle, but a check of the truck's vehicle identification number showed that the truck was registered to [Nickelberry].  A picture of the truck admitted at trial revealed a hat matching the description of the one worn by [Nickelberry] during the robbery, and the hat found in the truck also was admitted into evidence.

*Nickelberry*, 2012 WL 1427376, at *2-3.

With respect to the items found at the house, the appellate court concluded:

[T]he testimony above demonstrates that such a challenge would have lacked merit, because police initially searched the home with the consent of the homeowner. "With regard to a warrantless search of property, it is well settled that such is reasonable under the Fourth Amendment where proper consent is given."  (*People v. Oldham* (2000) 81 Cal.App.4th 1, 9; *see also People v. Carr* (1972) 8 Cal.3d 287, 298 [search not unreasonable when made with consent of third party whom police reasonably and in good faith believe has authority to consent].)  Once they saw the briefcase suspected to be connected to [Nickelberry] in the course of the lawful search, the police obtained a search warrant before seizing and searching it.  We agree with respondent that all these facts support a finding that the search of the house, as well as the search and seizure of the briefcase, was lawful, and that defense counsel was not obligated to make a meritless motion to suppress.  (*People v. Catlin* (2001) 26 Cal.4th 81, 163.)

*Id.* at *2.

The Court of Appeal likewise rejected the claim that counsel should have moved to suppress evidence from the truck after finding that the record did not indicate why counsel acted or failed to act in the manner challenged and counsel's approach could have been a reasonable, tactical decision.  *Id.* at *3.  The appellate court further concluded that Nickelberry failed to establish prejudice because he could not demonstrate a reasonable probability that, but for counsel's failure to file such a motion, the result of the trial could have been different.  *Id.*  It reasoned:

> The pizza restaurant employee positively identified [Nickelberry] both on the day of the robbery and at trial, and the restaurant customer whose cell phone was taken said that, although he was "not a hundred percent on [his] identification," [Nickelberry] looked like the person who robbed him.  The jury also heard testimony that the gun located in the home where [Nickelberry] was found was connected to him, and that it matched the description of the gun used during the robbery.  Police also recovered the cell phone taken during the robbery at the home where [Nickelberry] was found.  Even absent testimony regarding the contents of [Nickelberry's] truck, there is no reasonable probability that [Nickelberry] would have been acquitted.

*Id.*

With respect to the evidence obtained from the home, the Court of Appeal's conclusion that the officers obtained from the homeowner valid consent to search the home was not an unreasonable determination of the facts.  The United States Supreme Court held in *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973), that the voluntariness of consent "is a question of fact to be determined from all the circumstances."  The Court of Appeal reviewed the circumstances surrounding the alleged consent and found the consent to be voluntary.  That determination was not unreasonable.  Because the officers lawfully entered the home and obtained a search warrant before seizing and searching the briefcase found within it, it would have been futile for Nickelberry's counsel to move to suppress the evidence seized as a result of

10

that search.  Thus, counsel was not ineffective for failing to present such a motion.  *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (failure to raise a meritless argument does not constitute ineffective assistance).

Likewise, the appellate court's rejection of Nickelberry's claim regarding evidence seized from the truck was reasonable.  There is no evidence in the record that the officers conducted a warrantless search of the vehicle.  Even assuming that the police searched the truck without a warrant, the record indicates that such search was proper.  Probable cause exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place," based on the totality of circumstances.  *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  This "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false."  *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).  Here, the vehicle was registered to Nickelberry and, once the employee identified Nickelberry as the robber, the police had ample cause to believe that the vehicle had been used in the robberies.

Moreover, the Court of Appeal's determination that Nickelberry failed to demonstrate prejudice is also reasonable.[5]  As the Court of Appeal observed, given the evidence against Nickelberry, it was not unreasonable for the state court to conclude that, had counsel

---

[5]    Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel and the state court has found that counsel made an error, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); see *also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).

successfully moved to exclude the cap found in the truck, the result of the proceeding would have been different.  Under these circumstances and given the deference afforded the state court's determination, this Court does not find unreasonable the state court's conclusion that Nickelberry was not prejudiced by counsel's failure to suppress the evidence seized from the truck.  Accordingly, Nickelberry cannot prevail on his claims that trial counsel should have moved to suppress the tangible evidence.

3.     *Failure to Suppress Show-Up Identification (Claim 3)*

Nickelberry likewise contends that counsel was ineffective for failing to move to suppress the employee's in-court identification based on a suggestive field show-up.  On direct appeal, the Court of Appeal noted:

> The pizza restaurant employee testified at the preliminary hearing that about 30 to 40 minutes after the robbery, he was taken to view a suspect.  The employee viewed [Nickelberry] standing about 20 to 30 feet away, during daylight hours.  [Nickelberry] was in handcuffs, standing outside a police car with two or three police officers next to him, and [Nickelberry] was the only suspect the restaurant employee was asked to view. At trial, the employee testified that he viewed [Nickelberry] about an hour after he was robbed, and that he identified [Nickelberry] as the person who committed the crime.

*Nickelberry*, 2012 WL 1427376, at *4.

It ultimately rejected Nickelberry's claim after concluding that there was insufficient evidence in the record to demonstrate that the show-up identification was unduly suggestive. Such a determination constitutes a decision on the merits.  *See Phelps v. Alameida*, 569 F.3d 1120, 1126 n.8 (9th Cir. 2009) (rejection of claim for failure to state prima facie case constitutes denial on the merits of the claim).

Evidence derived from a suggestive pretrial identification procedure may be inadmissible if the challenged procedure was "so impermissibly suggestive as to give rise to a very substantial

likelihood of irreparable misidentification." *See Simmons v. United States*, 390 U.S. 377, 384 (1968). To determine the admissibility of identification testimony, courts use a two step analysis. *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984). First, they determine whether the identification procedure was impermissibly suggestive. *Id.* Each case must be considered on its own facts, and whether due process was violated depends on the totality of the surrounding circumstances. *Simmons*, 390 U.S. at 383-84. If the court finds that a challenged procedure is not impermissibly suggestive, the due process inquiry ends. *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985). However, if a court finds that the procedure was impermissibly suggestive, it then determines whether the identification was nevertheless reliable under the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972); *Love*, 746 F.2d at 478.

The factors to be considered in evaluating the reliability of an identification after an impermissibly suggestive identification procedure include:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200. These five indicia of reliability must be balanced by the reviewing court against the corrupting effect of the suggestive pretrial identification procedure to determine whether the in-court identification should have been admitted. *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). In a motion to suppress, the defense bears the burden to show the unconstitutionality of the identification procedure. *See People v. DeSantis*, 831 P.2d 1210 (Cal. 1992).

Again, to prevail on a claim of ineffective assistance of counsel predicated on counsel's failure to file a motion to suppress evidence, a petitioner must establish both that the motion would have been meritorious and a reasonable probability that the jury would have reached a different verdict absent the introduction of the evidence. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003). Nickelberry does not do so here because he fails to demonstrate that the field show-up identification procedure was impermissibly suggestive or unreliable given the totality of the circumstances.

First, the mere fact that the employee identified Nickelberry in a one-person field show-up did not itself render such identification invalid or inadmissible. *See United States v. Jones*, 84 F.3d 1206, 1210 (9th Cir. 1996). Nor does the fact that petitioner was obviously in police custody. *See, e.g.*, *id.* at 1209-10 (upholding show-up of defendant standing by side of road near police officers who were holding robber's wig, hat and sunglasses); *Bagley*, 772 F.2d at 492-93 (upholding identification at show-up where defendant was seated in police car, handcuffed, and surrounded by police). And as the Court of Appeal concluded, none of the arguments Nickelberry advanced on appeal regarding the alleged suggestiveness of the show-up were supported by the record.

Moreover, even assuming that the show-up was impermissibly suggestive, Nickelberry's claim fails because the record supports the conclusion that the field show-up identification was nevertheless reliable under the totality of the circumstances. Here, the employee identified Nickelberry within an hour of the robbery. His testimony indicates that he had ample time to observe Nickelberry, who had been in the pizza restaurant for approximately 15 minutes before

the robbery.  Again, there is no evidence in the record supporting Nickelberry's assertions on direct appeal that police officers acted improperly or otherwise coerced a positive identification.

In light of the foregoing, there is no reasonable probability that a motion to suppress the field show-up identification and its potential fruits would have succeeded.  Nickelberry is therefore not entitled to relief on this ineffective assistance claim either.

4.      *Failure to Cross-Examine Witnesses (Claim 4)*

Nickelberry next asserts that counsel failed to properly cross-examine the prosecution's witnesses at the preliminary hearing and at trial.  On direct appeal, Nickelberry complained that counsel did not cross-examine the police officer at the preliminary hearing about the neighbor who directed him from the vehicle to the home where Nickelberry was found or ask him about the criminal background of two individuals who were also found at the house.  He also claimed that counsel was ineffective at trial for failing to impeach the officer with his preliminary hearing testimony and failing to ask him if the hood of the vehicle was cold when he found it.  Nickelberry also contended that counsel failed to impeach the employee with his preliminary hearing testimony, ask him about the suggestive circumstances of the field show-up, or properly discredit his identification based on statements the employee made during the robbery.  Finally, he alleged that counsel could have discredited the employee's identification of the hat with the employee's statement at the preliminary hearing that the robber was wearing a hat or a hood.

The Court of Appeal considered and rejected the claims as follows:

> *Police officer's testimony regarding finding [Nickelberry]*: The police officer who tracked down [Nickelberry's] truck and later located [Nickelberry] in a nearby house testified that after he found the truck, a neighbor told the officer that he had seen the man who owned the truck going into a home on El Dorado Street.  The neighbor gave the officer a description of the man that matched the description of the robbery suspect (an "extremely large" black man), and the officer testified that he was "personally familiar"

15

with the house, because police had "made numerous arrests there for subjects that were engaged in criminal activity in the past." [Nickelberry] claims that the testimony about the neighbor was "strange," and that defense counsel was ineffective for not asking why the neighbor would notice such a "mundane event." He likewise claims that defense counsel was ineffective for failing to question the officer's story at trial that the truck was parked "five to seven blocks" away from the house where [Nickelberry] was found.

As set forth above, unlike this court, [Nickelberry's] trial attorney had access to materials outside the record, and interacted with opposing counsel and the judge. We therefore should not second-guess counsel's assistance absent a showing that his performance amounted to incompetence under prevailing professional norms. (*Harrington v. Richter*, [562 U.S. 86, 131 S. Ct. 770, 788 (2011)]). It may be that defense counsel had access to information that would support the neighbor's version of events, and [Nickelberry] does not explain how cross-examination on this topic would have led to a different result in any event. As for the testimony about the distance between the truck and the house where [Nickelberry] was found, it may well be that the officer misspoke, and was actually referring to the distance between the pizza restaurant and where the truck was found, consistent with the prosecutor's comment on that distance during closing argument. In that case, clarification on cross-examination only would have highlighted that the truck was in fact found closer to the home.

*Testimony regarding other occupants of home where [Nickelberry] was found*: The same police officer testified at the preliminary hearing that other occupants of the house where [Nickelberry] was found, including two other men besides [Nickelberry], came out of the home when police cleared the residence. [Nickelberry] claims, without citation to the record, that [Nickelberry's] shotgun was found in a bedroom shared by those two men, and that defense counsel was thus ineffective for failing to ask more about the men's backgrounds. First, although the officer testified that the gun was found in a bedroom, [Nickelberry] directs this court to no evidence that either of the other occupants of the home was connected with that bedroom. Second, again, [Nickelberry] does not explain how asking about the two men would have changed the outcome of the trial. As respondent notes, an investigation of the two men may have revealed no evidence of possible third-party culpability.

*Description of Ms. Banks*: At the preliminary hearing, the police officer described Ms. Banks as "the actual homeowner" of the residence where [Nickelberry] was found, stated that she was "an elderly black female," and testified that she came out of the house with "children, small children," as well as with two men. At trial, the officer testified that Ms. Banks came out of the house with "maybe four small children," and that a man who was not mentioned at the preliminary hearing also came out of the home with her. Ms. Banks testified at trial that she was five months pregnant on the day her home was searched (as opposed to being elderly), and the police officer described her as "the actual renter [as opposed to owner] of the location." Although defense counsel did not cross-examine witnesses regarding the description of Ms. Banks, as [Nickelberry] claims,

these details are so tangential to the issue of [Nickelberry's] guilt that we see no reason to set aside the jury's verdict based on the failure to ask such questions.

*State of [Nickelberry's] truck*: The police officer who testified at the preliminary hearing stated that, when he found [Nickelberry's] truck, the hood was cold. As [Nickelberry] notes on appeal, defense counsel did not elicit this information at trial, and instead simply pointed out during closing argument that there was an absence of evidence over whether the truck was warm to the touch. Testimony at trial revealed that the pizza restaurant that was robbed was located at 2820 Sonoma Boulevard in Vallejo, and that [Nickelberry's] truck was found in the 100 block of Michigan Street in Vallejo. Although there was no testimony regarding how close those two locations are, the prosecutor stated during rebuttal argument, without objection, that the truck was parked about seven blocks away from the pizza restaurant. Absent a clear indication that the truck would have been warm after having been driven only seven blocks, then parked for some period of time before the officer found it, we do not consider the failure to ask about this fact to have been crucial to [Nickelberry's] case. In fact, any testimony about the truck's hood being cold may have served only to undermine [Nickelberry's] testimony that he had been driving with his uncle for about 45 minutes to more than an hour before he returned to the house where he was later found.

*Restaurant employee's testimony regarding gun*: At the preliminary hearing, the restaurant employee described the gun that was used during the robbery as "a full, long barrel, as I was like—inch [ sic ] width of, you know, the (indicating) exit point," but apparently was not shown the gun in question. At trial, the employee was shown a 19-inch shotgun, and he identified it as the gun that [Nickelberry] used during the robbery. [Nickelberry] claims that his attorney was ineffective for not asking about the employee's description of the gun at the preliminary hearing as having a full, long barrel. Without a picture of the gun or any indication that the employee's testimonies were inconsistent, [Nickelberry] has not shown that eliciting information from the preliminary hearing would have changed the outcome of the trial.

*Restaurant employee's testimony regarding identification*: The restaurant employee testified at trial that he called 911 after the robbery, and told the dispatcher that there was a witness who could probably give a "better description" of the robber, then handed the telephone to the customer whose cell phone was taken. On cross-examination, defense counsel questioned the employee about how closely he paid attention to [Nickelberry] during the time before the robbery, and elicited testimony that the employee was "just doing [his] duties," and that the time spent talking with [Nickelberry] was "very brief." During closing argument, defense counsel argued that although the employee testified that he was able to identify [Nickelberry] on the day of the robbery, "do you think you can make a mistake[?] Did you hear anything at all about this lineup, anything about the credibility about it, was it even a lineup[?] What do you know[?] I mean, that's typical of everything the prosecution has done here. They want you to make these big leaps, these big leaps to connect everything which they never did."

17

[Nickelberry] argues that his counsel was ineffective for failing to ask why the employee was certain of his identification of [Nickelberry], if he had previously told a dispatcher that there was someone else who probably could give a better description of him.  He further argues that counsel likewise failed to highlight the suggestive circumstances of the show-up identification procedure.  However, a review of the trial transcript reveals that counsel did highlight to the jury possible shortcomings with the identification procedure, noting that the employee may not have been paying close attention to [Nickelberry's] appearance when he was first in the restaurant.  It may also be that drawing more attention to the identification process could have served only to highlight the employee's certainty about his identification.  The prosecutor argued to the jury, without objection, that [Nickelberry] had distinctive features—referring to him as "huge" and having "dreads down to his shoulders."  Questioning the employee further about his identification of [Nickelberry] may have served only to highlight the employee's certainty over the identification of a person with such distinctive characteristics.  We cannot conclude on the record before us that counsel's performance "fell below an objective standard of reasonableness." (*Strickland*, *supra*, 466 U.S. at p. 688.)

*Description of hat [Nickelberry] wore during robbery*: At the preliminary hearing, the prosecutor asked the customer whose cell phone was taken whether the person who robbed him had the same type of hair ("long jheri curls") as [Nickelberry] did in court.  The customer testified that he could not see much of the robber's hair, because "his head seemed to be framed.  There seemed to be something on his head; whether it was a hood of a sweater or something over the top so the sides of his hair wasn't—wasn't really evident, I could see some of the front of the hair and the shape of his face, but that's why I can't—"  When asked for a more detailed description, the customer testified, "If I was asked to pick a color, I would probably choose olive green, something like that. It didn't seem to me to have a bright color.  To me, it didn't seem to be black.  It wasn't white, so I don't remember it as being a striking color."  At trial, the prosecutor asked the customer whether a "green beanie" admitted into evidence looked familiar, and the customer testified that the beanie "appears to be what the person had on their head, the person that I encountered in the parking lot."  [Nickelberry] claims that defense counsel never asked about how the witness could identify the beanie at trial, when he was not able to describe at the preliminary hearing whether the robber was wearing a hat or a hood. However, unlike at trial, at the preliminary hearing the customer was not shown a particular piece of clothing.  Moreover, the customer's description at the preliminary hearing of what [Nickelberry] was wearing—something green on his head—does not appear to be inconsistent with his testimony at trial.  We cannot say on the record before us that failure to cross-examine the customer on this detail caused tangible harm to the defense. (*People v. Carter*, [117 P.3d 476, 492 (Cal. 2005)].)

*Description of gun*: The customer who was robbed testified at the preliminary hearing that [Nickelberry] used a gun during the robbery, and that it "looked like it could be a shotgun of some sort."  At trial, the customer testified that "[w]hat caught my

attention [about the firearm] was that the end had been cut or sawed off somehow and that there was a jagged edge," and he identified People's exhibit No. 1 as the gun that was used during the robbery.  He further testified that he was "not a hundred percent" on his identification of [Nickelberry], and that he was focusing more on [Nickelberry's] gun than on his face during the robbery.  As for whether he was certain of his identification of the weapon at trial, he testified on cross-examination, "My feeling on the weapon is 100 percent."  We do not agree with [Nickelberry] that his trial attorney was ineffective for failing to elicit on cross-examination why the customer did not describe the shotgun during the preliminary hearing as having a jagged edge, when he was apparently not asked to describe the gun in great detail at that time.

    In sum, "[t]he cross-examination of witnesses is a matter falling within the discretion of counsel, and rarely provides an adequate basis on appeal for a claim of ineffective assistance of counsel.  [Citations.]  Because [Nickelberry] fails to disclose what evidence, if any, counsel might have elicited had he subjected prosecution witnesses to more rigorous cross-examination, his claim of inadequate assistance does not succeed." (*People v. Frye* (1998) 18 Cal.4th 894, 985, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

*Nickelberry*, 2012 WL 1427376, at *5-8.

    As the appellate court noted, counsel's tactical decisions, including refraining from cross-examining witnesses or from asking a particular line of questions, "are given great deference." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000); *see also Gallo v. Kernan*, 933 F. Supp. 878, 881 (N.D. Cal. 1996) ("It is well settled that impeachment strategy is a matter of trial tactics.").

    Nickelberry's claims regarding the ways that defense counsel's cross-examinations could have been augmented employ the type of "hindsight analysis" that is expressly prohibited on federal habeas review.  *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").  The question before this Court is whether the state court reasonably determined that his lawyer's performance was not ineffective.  A review of the record before this Court indicates that the Court of Appeals' conclusions, based on its thorough and

well-reasoned review of the evidence, are not unreasonable or in contravention of federal law.

Nickelberry's claim of ineffective assistance premised on inadequate cross-examination

therefore must fail.

5.      *Ineffective Closing Argument (Claim 5)*

Finally, Nickelberry contends that counsel was ineffective for failing to highlight in

summation the fact that the employee stated that the robber was armed with a rifle as opposed to

a shotgun.  On direct appeal, Nickelberry argued that "[t]his fact, had it been brought to the

jury's attention during closing argument, would have blown the prosecution's case out of the

water."

The Court of Appeal rejected the claim, concluding:

> We agree with respondent that [Nickelberry] "clearly overstates the importance of the exchange during cross-examination," and that calling [Nickelberry's] gun a rifle instead of a shotgun did no more than demonstrate that the witness was not overly familiar with firearms.  [Nickelberry] has made no showing that highlighting such a meaningless misstatement by the witness would have led to a different outcome at trial.

*Nickelberry*, 2012 WL 1427376, at *8.

The Court of Appeal's rejection of the claim was reasonable.  When asked during cross

examination whether he was familiar with firearms, the employee replied, "Not really.  I fired

some, I guess."  The record therefore supports the appellate court's reasoning that counsel's

highlighting the misstatement would only demonstrate that the employee was not particularly

familiar with firearms, which was fully consistent with his testimony.  Nickelberry therefore

cannot demonstrate that counsel was ineffective in failing to highlight a meaningless

misstatement or that highlighting the misstatement would have led to a more favorable result.

Nickelberry thus cannot prevail on this claim.

20

B.      Denial of Motions to Substitute Counsel (Claim 6)

        Nickelberry next argues that the trial court improperly denied his two *Marsden* motions

for substitute counsel.  The Court of Appeal summarized the following facts underlying this

claim:

> a. First *Marsden* motion
>        Before trial, [Nickelberry] filed a motion requesting that the trial court dismiss
> [Nickelberry's] prior strike, pursuant to *People v. Superior Court (Romero)* (1996) 13
> Cal.4th 497.  The trial court denied the motion after counsel submitted on the motion at a
> hearing on April 27, 2010.  [Nickelberry] then told the trial court that he wanted a new
> attorney because he did not think that his current counsel was capable of representing
> him, and stated that he had a written motion available for the trial court's consideration.
> The trial court told [Nickelberry] that [he] could file a written motion if he wanted, but
> that the court could consider his request for a new attorney without a formal motion.
> [Nickelberry] chose to present his motion orally (without filing any paperwork), and the
> trial court held a hearing later that day outside the presence of the prosecutor, pursuant to
> *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).
>        At the hearing, [Nickelberry] complained that his attorney was not spending
> adequate time on his case, and had "put mine on the back burner."  The court explained
> that any lawyer who represented him would be handling other cases, and that "[y]ou
> don't want the lawyer that only has your case."  When asked whether there were specific
> tasks that [Nickelberry] had asked his attorney to perform that were not done,
> [Nickelberry] complained that he wanted to know whether police had found fingerprints
> on the gun that had been seized.  He also requested that counsel check into "the
> background of the officer" (presumably, the one who had testified at the preliminary
> hearing), but that "none of it came into play into Court [sic]."  [Nickelberry] further
> complained that his attorney had told him that he was "'going to lose,'" and asked, "What
> are you [meaning, his attorney] here for me to represent me if you just come in and say,
> 'Oh, no, you are going to lose.  You have to take this deal.'"  He also was disappointed
> that his attorney had told him that he would lose his *Romero* motion, and was under the
> mistaken impression that his attorney had been obligated to file such a motion before
> trial.  The trial court told [Nickelberry] that "[t]he reason you lost the *Romero* motion
> wasn't because of your lawyer; it was the Court denied it."  The court also explained that
> "it was well-written what he gave me.  It wasn't one of these ones that I just denied off
> the top of my head."  Finally, [Nickelberry] complained that every time he talked with his
> attorney, "we have like a, it's like, you know, kind of conflict, basically."
>        Defense counsel explained that the district attorney was still trying to determine
> whether there were any fingerprints on the recovered gun, but there had been no results
> yet.  As for obtaining "background" on the officers, counsel explained that "[t]he officers
> were not a primary witness or anything.  It is not even relevant to the issue in this case."
> When asked whether counsel had a conflict with [Nickelberry], [Nickelberry's] attorney

responded, "No.  I've been very candid with him.  It's a very difficult case.  There are multiple ID's.  They're not officers that place him at the scene; plus, a number of other evidence that places him there immediately in the area afterwards.  [¶]  I'd given him my honest assessment of the case.  He quite frankly doesn't believe me when I explained to him that he's not even eligible for probation, not only because of the prior strike, but because of the manner in which it is charged and the use of the weapon.  [¶]  I cannot—I've explained that to him repeatedly.  He does not like those answers . . . ."

[Nickelberry] then speculated that the police officer involved "could have lied in previous cases," and he pointed out that he did not live at the house where he was arrested.  Finally, [Nickelberry] complained that the police report stated that the suspect weighed 135 pounds (considerably less than [Nickelberry] weighed).  His attorney noted that he had questioned the officer about the discrepancy during the preliminary hearing, and that the discrepancy was explained to be due to inadvertently transposing numbers when preparing the report.  The trial court noted that the discrepancy was "something we can deal with at trial," and denied [Nickelberry's] *Marsden* motion.  [Nickelberry] then asked, "So I have to keep this lawyer?"  The trial court answered, "No, you can hire your own lawyer at your own cost, but I'm not appointing another one."  After the courtroom was reopened and the trial court discussed scheduling a trial date with counsel, the court told [Nickelberry], "If you hire a lawyer, let me know, Mr. Nickelberry.  I'll put this [a June 30th trial date] on calendar; probably have to continue your matter."

### b. Second *Marsden* motion

At a trial management conference on June 28, 2010, [Nickelberry] stated that he wanted to file another *Marsden* motion, handed a written motion to the trial court (Judge Robert Bowers, the same judge who had considered the previous *Marsden* motion), and informed the court that his mother was in the audience and available to testify as a witness.  The trial court permitted the written motion to be filed, but denied it as untimely.[FN6]  [Nickelberry] protested that "I'm not going to go to trial with this lawyer," and that his attorney had "cursed me out.  He called me fucking stupid and crazy.  He's fucking stupid and crazy, you know?  And I'm not going to trial with this lawyer, you know."  In response to [Nickelberry's] statement that he wanted to represent himself, the trial court suggested that [Nickelberry] "fill out a *Faretta* waiver form and bring it on Wednesday.  I don't advise you to go pro per, but you can do that."  The following exchange then took place:

> FN6. It is unclear whether [Nickelberry] was attempting to file the written motion that he had prepared in advance of the April 27 hearing. The written motion is dated June 28, but raises many of the same complaints that [Nickelberry] addressed at the April 27 hearing (such as the fact that his attorney had not determined whether fingerprints had been recovered from the gun at issue, and had prepared an inadequate Romero motion). After denying [Nickelberry's] second motion, the trial court stated, "I've read [the motion]; it's similar."

"[Nickelberry]: I want to waive my trial date; don't want to—

22

"The Court: We're not doing that. [¶] It's—this has been set for trial for a while.

"[Nickelberry]: No, it hasn't. I didn't want to go to trial.  I told the Court system that I did not want to go to trial, but you keep pushing me towards going towards trial.

"The Court: Right; you don't have a choice.

"[Nickelberry]: My lawyer, you—I should have a choice.  It's my life.  I should have a choice.

"The Court: Let me tell you: You are charged with these crimes.  You want to plead open, you can do that.  If not, you don't want to accept the deal of the People, we're going to trial.

"[Nickelberry]: No, I need time. I need time and I'm not ready to go to trial.

"The Court: Not happening.

"[Nickelberry]: I need time to find a new lawyer.

"The Court: It's not happening.

"[Nickelberry]: How—how is that not possible, though?

"The Court: This took place last year.  [¶]  I'm not wasting the Court's time.  This has been set for trial since—

"[Nickelberry's attorney]: Late April.

"[Nickelberry]: If you read my *Marsden* that I filed, there's—there's specific reasons I wrote on there that why [sic] I'm not ready for trial.

"The Court: No, you are not—you want a new lawyer, and that's what a *Marsden* motion is about.  I denied that.

"[Nickelberry]: It's because some of the situations that my lawyer has not did [sic] for me with case laws that he did not file that coincides with my case, that, that if I would—if he would have filed them under the right case law, maybe it would have helped my case out more.

"The Court: I'm going to let you fill out a *Faretta* form; don't go anywhere, and you can represent yourself this week.  As to whether Judge Moelk wants to give you a continuance or not, that will be up to him.  [¶]  I'll tell you right now, I'm not going to tolerate too much of this, Mr. Nickelberry. I will get you to trial."

23

The trial court gave [Nickelberry] a *Faretta* form and told him, "I'm going to leave it up to Judge Moelk.  He . . . may grant your continuance on Wednesday at trial; I doubt it, um, but if you can't be ready to represent yourself on Wednesday, then I think the Public Defender will be representing you, as your request is untimely.  [¶]  If he grants your request, then it will be put over."

Two days later, on the day trial was scheduled to begin, there apparently was no available courtroom in Vallejo (where witnesses were located), but the trial court (Judge Peter Foor) asked about the status of the case at a hearing in Fairfield.  The court asked [Nickelberry] if he had completed a *Faretta* waiver form, and [Nickelberry] responded that he did not want to represent himself, and instead wanted a new appointed lawyer.  After an unreported bench conversation, the trial court stated that a hearing would be held on [Nickelberry's] second *Marsden* motion.

After the courtroom was cleared, [Nickelberry] claimed that on June 10, his attorney had told him that he was "crazy" and called him "a couple [of] curse words, and he said that I was crazy for not taking the deal, and basically he was threatening me with taking this deal, and he told me he didn't care who I told."  [Nickelberry] also complained that his attorney was "just inadequate," and was "not really doing what he's supposed to do."  He said his attorney was "not sending no investigators out that actually, basically talk to the prosecution, I guess, you know.  And he didn't have no basically—at my *Romero* hearing—yeah, the *Romero*, basically, he didn't have no defense for me," and prepared an inadequate motion.  [Nickelberry] further complained that counsel had visited him only about four or five times in the six months that he had represented him, and that "every time he comes all he talks about is me signing this deal and threatening me with this deal."  He also reported that he had told his attorney that he had a drug problem, and that he had been accepted for a program (apparently at Delancy Street), but that his attorney told him that he would "never get that."

The trial court explained to [Nickelberry] that he was "absolutely ineligible for probation," and there was thus "absolutely no point about talking about Delancy Street." [Nickelberry's] attorney added that he had repeatedly told [Nickelberry] that he was ineligible for probation, that he had prepared a strong *Romero* motion, and that the district attorney was not offering any type of plea bargain that would make him eligible for probation.  Counsel also stated that he had met with [Nickelberry] more often than [Nickelberry] claimed, that [Nickelberry] was unable to help counsel or "point me in any direction that would he[l]p me," and that because there was no available alibi, there was "limited stuff I could do.  I did what I could do."  [Nickelberry's] attorney acknowledged that he had told [Nickelberry] that he was "full of shit" for directing him to have co-counsel sitting next to him at trial, but that he "never told [Nickelberry] he was crazy."  Counsel also stated that he was prepared to go to trial.

The trial court told [Nickelberry] that it sounded as if there was strong evidence of [Nickelberry's] guilt, and that it was defense counsel's responsibility to be honest with his client, even if that leads to "bad feelings" because counsel "tells you things you don't want to hear."  The trial court denied the *Marsden* motion, stating that counsel was ready to go to trial.  The court then asked if [Nickelberry] still wanted the trial court to consider a *Faretta* waiver, and [Nickelberry] stated that he did not.  [Nickelberry] did not request

24

any additional time to prepare for trial or to retain his own attorney. Trial began on July 1, 2010.

*Nickelberry*, 2012 WL 1427376, at *8-11.

The Sixth Amendment right to counsel guarantees to an accused the concomitant rights to conflict-free representation and the effective assistance of counsel. *See Wheat v. United States*, 486 U.S. 153, 156 (1988); *Strickland*, 466 U.S. at 686. These rights may be infringed if an accused and his counsel become embroiled in an irreconcilable conflict. *See Christeson v. Roper*, ___ S. Ct. ___, 2015 WL 232187, at *3-4 (Jan. 20, 2015); *Martel v. Clair*, 132 S. Ct. 1276, 1284 (2012); *see also Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("[F]orcing a defendant to go to trial with an attorney with whom he has an irreconcilable conflict amounts to constructive denial of the Sixth Amendment right to counsel." (citing *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) ("[T]o compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.")).

However, "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)). The Sixth Amendment does not require or guarantee, implicitly or otherwise, that an attorney-client relationship be "meaningful" or free of discord. *Morris*, 461 U.S. at 13-14; *see Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc) ("[Petitioner] has cited no Supreme Court case—and we are not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts, but with whom the defendant refuses to cooperate because of dislike or distrust."). Rather, an asserted conflict crosses the constitutional

25

threshold "only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel." *Stenson*, 504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026); *see also Daniels*, 428 F.3d at 1197 (the nature and extent of the conflict must be such as to "deprive[] the defendant of representation guaranteed by the Sixth Amendment." (citing *Schell*, 218 F.3d at 1027)).   Denial of a *Marsden* motion to relieve and/or substitute appointed counsel may implicate these Sixth Amendment concerns.  *Schell*, 218 F.3d at 1021 ("Normally, the essence of such a motion is that appointed counsel's representation has in some significant way fallen below the level required by the Sixth Amendment.").

On habeas review, the ultimate constitutional question is whether the state court's disposition of a *Marsden* motion violated the petitioner's right to counsel because the asserted conflict between the petitioner and appointed counsel "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  *Id*. at 1026.  If the Court determines the existence of a conflict so serious that it "resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required," and the "trial shall be presumed to have been unfair."  *Id.* at 1027-28 (citing *Strickland*, 466 U.S. at 692).  "If the serious conflict did not rise to the level of a constructive denial of counsel, [the petitioner] would have to prove he was prejudiced by the conflict."  *Id.* at 1028.

The Ninth Circuit has identified three factors guiding the reviewing court's determination of whether a conflict with counsel was "irreconcilable" such that the substitution of counsel was constitutionally required.  Foremost, the court should consider the nature and extent of the conflict; namely, the cause of the conflict and the circumstances in which it developed, and

whether the defendant had legitimate reasons for the loss of confidence in his counsel.  *See id.* at

1026-27 (the reviewing court should determine how far the attorney-client relationship had

deteriorated and whether any conflict was of the defendant's "own making" or arose from

decisions properly left to counsel).  In this regard, "[d]isagreements over strategical or tactical

decisions do not rise to [the] level of a complete breakdown in communication."  *Stenson*, 504

F.3d at 886 (citing *Schell*, 218 F.3d at 1026); *see also United States v. McKenna*, 327 F.3d 830,

844 (9th Cir. 2003) (holding that a dispute with respect to trial tactics "is not a sufficient conflict

to warrant substitution of counsel"); *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir.

1987) ("[A]ppointed counsel, and not his client, is in charge of the choice of trial tactics and the

theory of defense.").  The court should also consider the adequacy of the inquiry and the

timeliness of the motion to substitute counsel.  *Stenson*, 504 F.3d at 886; *Schell*, 218 F.3d at

1024-25.  Particularly, the court should examine whether the inquiry undertaken by the trial

court was "such [as] necessary . . . [to] ease the defendant's dissatisfaction, distrust and concern"

and whether the inquiry conducted "provide[d] a sufficient basis for reaching an informed

decision . . . regarding whether to appoint new counsel."  *Stenson*, 504 F.3d at 886 (citations,

internal brackets, and quotation marks omitted); *see also Schell*, 218 F.3d at 1025.

Preliminarily, to the extent Nickelberry is raising in this Court issues regarding the

proper application of state law, they are not cognizable in a federal habeas corpus proceeding.

*Swarthout*, 131 S.Ct. at 863; *Estelle*, 502 U.S. at 67-68.  A petitioner may not transform a state

law issue into a federal one by simply asserting a violation of due process.  *Langford v. Day*, 110

F.3d 1380, 1389 (9th Cir. 1996).  Thus, whether the state trial court violated state law under the

*Marsden* decision by denying Nickelberry's requests to substitute counsel is not cognizable in

27

these federal habeas proceedings. Rather, this Court must determine only whether the trial judges' actions deprived Nickelberry of his Sixth Amendment right to the effective assistance of counsel.

Based on a review of the record, this Court must conclude that they did not. The trial judges held lengthy hearings in closed courtrooms on both *Marsden* motions and allowed Nickelberry to fully air his concerns about counsel's performance. Nickelberry complained to the trial court about the extent of trial counsel's investigation, the inadequate time counsel spent on the case, counsel's inability to secure probation through a plea deal, counsel's inability to prepare an adequate defense, and counsel's negative assessments on the likely outcome of the case. Trial counsel explained that he had spent more time on the case than Nickelberry gave him credit and was constrained by the evidence in the case and Nickelberry's prior convictions and pending charges. Nickelberry's dissatisfaction with counsel's handling of his case did not rise to the level of a breakdown in communication. *See United States v. Franklin*, 321 F.3d 1231, 1238-39 (9th Cir. 2003) (defendant failed to show "extensive conflict" with counsel although he claimed that counsel failed to investigate, never responded to defendant's questions, and failed to act on information provided by defendant); *LaGrande v. Stewart*, 133 F.3d 1253, 1276-77 (9th Cir. 1998) (substitution of counsel not warranted despite defendant's complaints of inadequate time spent with counsel and counsel's gloomy predictions where record indicated that defendant was able to communicate with counsel). Accordingly, Nickelberry is not entitled to relief on this claim.

C.      Denial of Request for Continuance (Claim 7)

In a related claim, Nickelberry argues that the trial court committed reversible error by refusing his request for a continuance "to retain private counsel."

"[T]rial courts 'necessarily require a great deal of latitude in scheduling trials' and are therefore accorded broad discretion on matters of continuances." *Bradley v. Henry*, 510 F.3d 1093, 1103 (9th Cir. 2007) (quoting *Morris*, 461 U.S. at 11).  Accordingly, although the Sixth Amendment entitles criminal defendants who do not require appointed counsel to choose their attorneys, a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citations omitted); *see also United States v. Walters*, 309 F.3d 589, 592 (9th Cir. 2002) ("'A criminal defendant's exercise of this right [of counsel of choice] cannot unduly hinder the fair, efficient and orderly administration of justice.'" (citation omitted)).  Thus, a trial court's denial of a defendant's request for a continuance does not necessarily infringe upon his Sixth Amendment rights even when it results in the defendant remaining unrepresented at trial or remaining with a public defender whom the defendant believes is not adequately prepared for trial.  *See, e.g.*, *McCormick v. Adams*, 621 F.3d 970, 980 (9th Cir. 2010) (finding no constitutional error in denial of requested continuance so that counsel could be reappointed for defendant who earlier had waived counsel); *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (finding no constitutional error when the trial court denied the defendant's request for a continuance so he could retain private counsel out of concern that his public defender's preparation for trial was unsatisfactory).

29

"[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris*, 461 U.S. at 11-12 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).  There are no "mechanical tests" for determining when a scheduling decision was so arbitrary that it violated due process. *Ungar*, 376 U.S. at 589; *United States v. Kloehn*, 620 F.3d 1122, 1127 (9th Cir. 2010).  Instead, a federal habeas court must examine the circumstances in which the decision was made and the facts known to the trial court at the time. *Ungar*, 376 U.S. at 589.  In particular, the court must consider the petitioner's diligence in preparing for trial, the utility of the continuance, the probability that the objective of the continuance would have been achieved, and the extent to which the continuance would inconvenience the trial court and the opposing party. *See Armant v. Marquez*, 772 F.2d 552, 556-57 (9th Cir. 1985); *see also Kloehn*, 620 F.3d at 1127 (listing these factors).  Moreover, to succeed on a due process claim arising out of a denial of a continuance, the petitioner must, at a minimum, show some prejudice resulting from the court's denial. *Armant*, 772 F.2d at 556-57; *see also Kloehn*, 620 F.3d at 1127.

Here, the state court's analysis was objectively reasonable under both the facts of this case and clearly established federal law.  As the California Court of Appeal recognized:

> Although it is true that [Nickelberry] stated on June 28 that he "need[ed] time to find a new lawyer," this was in the context of telling the trial court that he wanted either a new appointed attorney or the opportunity to represent himself.  Unlike the defendant in *People v. Courts* (1985) 37 Cal.3d 784, upon which [Nickelberry] relies, [Nickelberry] here never identified a specific attorney he wished to retain, or demonstrated that he had made financial arrangements to so.  (*Id.* at pp. 787-789.)
>
> Moreover, the trial court did not deny a continuance outright.  Instead, the court told [Nickelberry] that, after he completed a form indicating that he wanted to represent himself, a different judge could rule on whether [he] could have more time to prepare for trial.  [Nickelberry] apparently never completed the necessary *Faretta* form, instead telling the trial court two days after he was given the form that he no longer wanted to represent himself.  After his second *Marsden* motion again was denied following a

30

hearing, [Nickelberry] made no further request for additional time, nor did he indicate that he wished to retain private counsel.  Under the particular facts and circumstances of this case, we find no error in the way that the trial court handled [Nickelberry's] repeated requests to have his appointed attorney replaced.

*Nickelberry*, 2012 WL 1427376, at *12.

In light of these circumstances, the state court's conclusion that the denial of the requested continuance did not violate Nickelberry's federal constitutional rights was consistent with clearly established federal law.  For the reasons enumerated by the Court of Appeal in rejecting this case, the trial court's decision to deny a continuance was neither unreasonable nor arbitrary.  As the record shows that the trial court's decision was reasoned, rather than arbitrary, this decision satisfied both the Sixth Amendment and the Due Process Clause.  *See Morris*, 461 U.S. at 11-12; *see also Houston*, 533 F.3d at 1079 (holding that the state court did not unreasonably apply federal law in upholding the denial of a defendant's request for a continuance when the trial court, *inter alia*, "evaluated [the defendant]'s diligence in timely retaining private counsel, and weighed the potential impact a continuance may have had on the victims and witnesses").  Accordingly, Nickelberry fails to state a constitutional violation and is not entitled to relief on this claim.

D.    Evidentiary Error (Claim 8)

Nickelberry further argues that the trial court erred in admitting as an exhibit a picture of the interior of his truck which showed a hat that matched the description of the hat that the witnesses said Nickelberry wore during the robbery.  When the prosecutor introduced the picture during the direct examination of the officer who found Nickelberry's truck, defense counsel objected to the admission of unspecified grounds, and the trial court stated that "we can talk about that."  On cross-examination, Nickelberry testified that the exhibit was a picture of his

31

truck.  On redirect, he testified that the picture showed items scattered around the front seat in a condition other than that in which he left his vehicle earlier that day.  Defense counsel again objected to the admission of the photograph for lack of foundation.  The trial court overruled the objection and the exhibit was admitted into evidence.

On direct appeal, Nickelberry re-asserted his challenge to the photograph on foundational grounds.  The Court of Appeal disagreed, concluding that Nickelberry's testimony that the exhibit depicted his truck was sufficient to lay a proper foundation for the photograph.  *Nickelberry*, 2012 WL 1427376, at *13.  The appellate court further concluded that, even assuming that the admission was error, it did not prejudice Nickerson given the other overwhelming evidence that Nickelberry was the robber.  *Id.*

As an initial matter, to the extent that Nickelberry contends that the trial court's admission of photograph violated California state evidentiary law, his claim fails to state a cognizable claim for federal habeas relief because such a claim involves only state law.  *See Estelle*, 502 U.S. at 71.  "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected."  *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987).  Further, this Court is bound by the California Court of Appeal's conclusion that the trial court did not err, as a matter of California law, in finding proper foundation under California Evidence Code § 1400.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (reiterating that state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court on habeas review).

Federal habeas relief is available only if Nickelberry can demonstrate that admission of the evidence rendered the trial fundamentally unfair.  *Estelle*, 502 U.S. at 72; *Jammal v. Van de*

*Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) (holding that issue on federal habeas review is

"whether the admission of the evidence so fatally infected the proceedings as to render them

fundamentally unfair").  Only when the jury can draw no permissible inferences from the

challenged evidence can its admission violate due process.  *Jammal*, 926 F.2d at 920.  Even then,

the erroneously admitted evidence must "be of such quality as necessarily prevents a fair trial."

*Id*. (citation and internal quotation marks omitted).

Nickelberry cannot satisfy this burden.  Even assuming, without deciding, that the court's

ruling violated due process, Nickelberry fails to demonstrate that he suffered prejudice as a

result.  Given the other overwhelming evidence against Nickelberry, as discussed above, the

admission of evidence that a cap matching the witnesses' description was found in Nickelberry's

truck did not have a "substantial and injurious effect or influence in determining the jury's

verdict," *Brecht*, 507 U.S. at 638, and the Court is without "grave doubt as to the harmlessness of

[any alleged] error," *Deck v. Jenkins*, 768 F.3d 1015, 1022 (9th Cir. 2014) (quoting *O'Neal v.

McAninch*, 513 U.S. 432, 437 (1995)).  The state court's rejection of Nickelberry's claim on this

basis[6] was not contrary to, or an objectively unreasonable application of, clearly established

federal law and was not based on an unreasonable determination of the facts in light of the

evidence presented.  Accordingly, Nickelberry cannot prevail on this claim.

---

[6]     Where the *Brecht* standard of prejudice applies, federal courts apply *Brecht*
"'without regard for the state court's harmlessness determination.'"  *Deck*, 768 F.3d at 1022
(quoting *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010)).  The *Deck* court explained
that "AEDPA deference to the [state court's] harmlessness determination is already subsumed
within the *Brecht* standard."  *Id.* at 1024 (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007)).

E.      Prosecutorial Misconduct (Claims 9 through 11)

        Nickelberry additionally claims that the prosecutor committed misconduct in a number of

ways.  Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of

whether the alleged misconduct violated due process.  *See Darden v. Wainwright*, 477 U.S. 168,

181 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's conduct "so

infected the trial with unfairness as to make the resulting conviction a denial of due process."

 *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover, "[o]n habeas review,

constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if

they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood*

*v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637-38 (1993)).

        1.      *Eliciting Evidence of Unemployment (Claim 9)*

        On direct appeal, Nickelberry argued that it was "serious misconduct to use evidence

concerning a defendant's unemployed and homeless status to characterize him as a parasite," and

to "argue his lack of income and financial needs as a criminal motive."  The Court of Appeal

provided the following background on this claim:

> [Nickelberry] testified on direct examination that, on the night before the events
> in question, he slept at the home where police found him after the robbery, left the house
> around 8:00 or 8:30 a.m. with his uncle, then returned to the house around 10:00 or 10:30
> a.m.  He then "ended up going upstairs because that's—because I get high.  I'm going to
> tell you the truth.  I was—we—they get high.  We was getting high at the time, and I
> went upstairs, and we was getting high."
>
> On cross-examination, the prosecutor asked [Nickelberry], without objection,
> about two prior convictions, then asked whether it "would . . . be fair to say you have not
> had a job your entire adult life?"  [Nickelberry] acknowledged that he was not employed
> at the time of the armed robbery, and that he was "snorting heroin" on the day in
> question.  [Nickelberry] further testified that heroin cost $30 per gram, that he sought it
> out on a regular basis because "I have to have it," and that he was addicted to the drug.
>
> Also during cross-examination, the prosecutor asked about a time when
> [Nickelberry] had lived in Texas.  [Nickelberry] testified that he had stayed with his aunt,

but the trial court sustained an objection to the prosecutor's question about whether the aunt "gave [Nickelberry] the boot out of Texas." The court also sustained an objection to the prosecutor's question about a telephone conversation [Nickelberry] had had the previous week asking his mother whether he could get assistance from his aunt.

During closing argument, the prosecutor stated, without objection, that "the Judge is going to tell you that motive can be used to show this particular individual over here committed that robbery because he had a motive to rob. You have heard him tell you, 30 bucks a gram, snorting up heroin, he's unemployed, where is he going to get this money. He's not working, and he needs his heroin because he told you, I'm addicted, I got to use it. There's his motive. There's the reason this man pulled that robbery right now because he's not working, but he wants his heroin. Not only wants his heroin, he needs his heroin." The prosecutor did not refer to [Nickelberry's] aunt during closing argument.

*Nickelberry*, 2012 WL 1427376, at *14.

As the Court of Appeal noted, under California law, "a defendant's poverty generally may not be admitted to prove a motive to commit a robbery or theft; reliance on such evidence is deemed unfair to the defendant, and its probative value is outweighed by the risk of prejudice." *People v. Koontz*, 46 P.3d 335, 358 (Cal. 2002). A decision of the Court of Appeals suggests, however, that "a defendant's need for money may be relevant to show motive in a robbery case. . . . [I]f a defendant has a drug habit which requires expenditures beyond his means, then such evidence is logically relevant to prove motive under Evidence Code section 1101." *People v. Reid*, 184 Cal. Rptr. 186, 190 (Cal. Ct. App. 1982).

Given that the prosecutor's argument stressed Nickelberry's inability to hold down a job but used that to argue that he has insufficient means to fund his drug habit, it is unclear whether the admission of such evidence was proper under California law. But again, any claim that the admission violated California state evidentiary law fails to state a cognizable claim for federal habeas relief. *See Estelle*, 502 U.S. at 71. Rather, the question is only whether the alleged

erroneous admission resulted in a trial so fundamentally unfair that it deprived Nickelberry of due process.  *Id.* at 72.

The Court of Appeal denied relief on the claim, finding no reversible error because, had counsel timely objected to the statements, the court could have issued an admonition to the jury that would have cured the harm.  *Nickelberry*, 2012 WL 1427376, at *15.  Construing Nickelberry's *pro se* Petition liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), counsel arguably should have objected to the prosecutor's references to Nickelberry's unemployment.  However, Nickelberry cannot show that counsel rendered ineffective assistance by failing to do so.  First, it is not clear that such objection would have been successful given the Court of Appeal's decision in *Reid*, as discussed above.  Moreover, given the overwhelming evidence against Nickelberry, as discussed throughout this opinion, there is no reasonable probability that the verdict would have been different absent the allegedly-improper motive evidence.  Nickelberry therefore cannot prevail on any argument advanced in this claim.

2.      *Lessening Burden of Proof (Part of Claim 10)*

Nickelberry likewise argues that the prosecution committed prejudicial misconduct in its rebuttal argument when, after eliciting testimony from the police officer that the City of Vallejo had filed for bankruptcy, he suggested that the city's financial problems meant that police were not required to provide evidence of Nickelberry's guilt.  The Court of Appeal considered and rejected this claim on direct appeal as follows:

a. Background

On cross-examination at trial, the officer who searched the house where [Nickelberry] was found was asked whether the gun that was found was tested for fingerprints or DNA.  The officer testified, "I am not sure if it ever got processed.  I know that there was a work order I completed when it was booked into evidence to have

processed and we handled it in such a way at that time so as not to contaminate it."  On redirect, the following exchange took place:

"Q There's no evidence of the prints ever being done on that gun; isn't that fair to say?

"A Not that I'm aware of.

"Q Is Vallejo still bankrupt?

"A I believe so.

"[Nickelberry's Attorney]: Objection, relevance.

"The Court: Sustained."

During his closing argument, defense counsel emphasized a purported lack of evidence connecting [Nickelberry] with the crime: "There's no money recovered.  Wouldn't that be around there somewhere.  Is there any fingerprints [sic] on anything at all.  Is there any DNA on anything.  No, none of that exists."  Counsel later highlighted the lack of fingerprints on the cell phone and briefcase that were recovered, and the lack of DNA on the hat that was found in [Nickelberry's] truck.

During rebuttal argument, the prosecutor stated, without objection: "[Defense counsel] says there's no prints, there's no DNA.  *This was an eyewitness who identified this guy who spent 15 minutes with him.  How much more do you need.*  This isn't television, you know, and this isn't, um, this unlimited source of funds that, um, fictional stories have, you know.  Television that's entertainment.  That's there to entertain.  That's why they have all these laser beam things and tricks and techniques.  This is the real world.  *And after 15 minutes of standing there next to [Nickelberry], you don't need DNA, you don't need fingerprints.  You don't need photographs.  You don't need anything else.*"  (Italics added.)

b. Analysis

[Nickelberry], omitting the italicized portions of the prosecutor's rebuttal argument, above, claims that the argument amounted to prosecutorial misconduct, because counsel was trying "to dissuade the jurors from demanding the most reliable evidence of [Nickelberry's] guilt or innocence, and persuade them that shoddy police work was necessitated by the City of Vallejo's bankrupt condition."  Reading the entire excerpt, however, it is clear that the prosecutor argued no such thing.  Instead, he was arguing that there was sufficient evidence to convict [Nickelberry], even absent fingerprint and DNA evidence.  Although it is true that the prosecutor asked a police officer whether Vallejo was bankrupt, the trial court sustained the objection, and jurors were later instructed that they were to disregard a question where the court sustained an objection, and that nothing the attorneys said during the trial or during summation was evidence.  (CALCRIM No. 222.)  Although the prosecutor argued that there was not an

37

"unlimited source of funds" to use things like "laser beam things and tricks and
techniques," this could not reasonably have been understood by the jury to mean that
police were not required to provide evidence of [Nickelberry's] guilt.  The rebuttal
argument did not amount to misconduct.

*Nickelberry*, 2012 WL 1427376, at *15-16.

The record fully supports Court of Appeal's finding of no prosecutorial misconduct.

"The prosecutors' comments must be evaluated in light of the defense argument that preceded

it."  *Darden*, 477 U.S. at 179.  An argument that is an "invited response" to defense counsel's

remarks does not prejudice the jury.  *United States v. Young*, 470 U.S. 1, 11-13 (1985).  Given

the argument advanced by defense counsel in closing argument, the prosecutor's comments were

not at all inappropriate, and certainly did not suggest that the prosecution had no burden to

establish Nickelberry's guilt.  Moreover, the trial court instructed the jury:

> A defendant in a criminal case is presumed to be innocent.  This presumption requires
> that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you that
> the People must prove something, I mean they must prove it beyond a reasonable doubt.
> Now, proof beyond a reasonable doubt is proof that leaves you with an abiding
> conviction that the charge is true.  The evidence need not eliminate all possible doubt because
> everything in life is open to some possible or imaginary doubt.
> In deciding whether the People have proved their case beyond a reasonable doubt,
> you must impartially compare and consider all the evidence that was received throughout the
> entire trial. Unless the evidence proves [Nickelberry] guilty beyond a reasonable doubt, he is
> entitled to an acquittal and you must find him not guilty.
> . . . .
> Nothing that the attorneys say is evidence.  In their opening statements and
> closing arguments, the attorneys discussed the case, but their remarks are not evidence.

This Court must assume in the absence of evidence to the contrary that the jury followed

those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481

U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow

their instructions"); *see Francis v. Franklin*, 471 U.S. 307, 323-24 & n.9 (1985) (discussing the

subject in depth).  Nickelberry thus cannot show that the prosecutor's comments led the jury to

38

believe that the police were not required to provide evidence of Nickelberry's guilt. The Court
of Appeal's rejection of this claim does not contravene or unreasonably apply federal law, and
Nickelberry is not entitled to relief on it.

>   3.      *Eliminating Presumption of Innocence (Part of Claim 10)*

Nickelberry similarly argues the prosecutor's arguments during rebuttal improperly
shifted the burden of proof and misstated the presumption of innocence.

The prosecutor argued during rebuttal argument:

> There's a presumption of innocence, and the defense does not have to do a thing
> during the course of a criminal trial. They don't have to call any witnesses.
> [Nickelberry] certainly doesn't have to testify. Um, and that's something that each and
> every one of us would wish for us if we were sitting at that table at any point in our lives
> or any member of your family or our friends. I'm with that. I'm okay with that. You
> hold me to my burden. All right. But once [Nickelberry]—once a defense puts that case
> on and actually supplies you with evidence, unanswered questions that they could have
> answered are subject to your scrutiny, and you can ask yourself these questions.
> . . . .
>
> I want to just close with two comments. One is, um, earlier today we talked about
> the presumption of innocence, remember when we were picking a jury, and we
> emphasized, I think to a great detail, that there's a presumption of innocence every time
> someone is charged with a crime and they're sitting at that table. Well, that presumption
> of innocence doesn't last forever. That presumption of innocence ended the moment we
> rested in this case, and you've heard all of this evidence. Because when you go back
> there and deliberate, there's no longer a presumption of innocence after you compare and
> contrast all of this evidence. You're going to look at this evidence, and that presumption
> is gone. That presumption is now off the table. It's for you to decide what the state [of]
> this evidence is.

Ex. L at 168, 172-73.

The Court of Appeal rejected Nickelberry's claim, concluding:

> We consider the prosecutor's argument comparable to statements made in *People
> v. Goldberg* (1984) 161 Cal.App.3d 170, 189. There, as here, the remarks "essentially
> restated, albeit in a rhetorical manner, the law as reflected in" section 1096, which
> provides that a defendant in a criminal action is presumed innocent until the contrary is
> proven. (*Goldberg* at p. 189.) In the context of the whole argument and the instructions,
> we see no reasonable likelihood that the jury construed the prosecutor's remarks as

urging jurors to rely on a standard other than proof beyond a reasonable doubt.  (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)

*Nickelberry*, 2012 WL 1427376, at *16.

Counsel are given latitude "in the presentation of closing arguments," and courts must allow prosecutors "to strike hard blows based on the evidence presented and all reasonable inferences therefrom."  *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (quoting *United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993)).  A reviewing court should consider challenged remarks in light of the realistic nature of closing arguments at trial.  In determining whether remarks rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision.  *Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden*, 477 U.S. at 179-82.

Here, considering the prosecutor's statements in the context of the overall argument reflects that it is not reasonably likely that a reasonable juror would have understood the prosecutor's argument as modifying or misstating the burden of proof.  And, again, the trial court instructed the jury "[a] defendant in a criminal case is presumed to be innocent" and that "[n]othing that the lawyers say is evidence."  Nickelberry thus cannot show that these statements constituted misconduct either.

4.      *Improper Argument regarding Nickelberry's Connection to the Truck (Claim 11)*

Nickelberry further argues that the prosecutor's use of an analogy in summation was misconduct because it contained facts not in evidence.  The Court of Appeal considered and rejected this claim as follows:

a. Background

The restaurant customer who was robbed testified that when he was talking to the 911 dispatcher, someone on a bicycle said he had seen the suspect flee, and information

40

about the suspect's vehicle (a gray truck) was relayed to the 911 dispatcher.[FN9]  The police officer who arrived at the scene of the robbery testified that he received information from witnesses, victims, and the dispatcher, including a description of the suspect's vehicle as "a silver Ford pickup older model."  Defense counsel highlighted during closing argument that the jury never heard testimony from the witness who described [Nickelberry's] truck, arguing that this absence of testimony was an example of gaps in the evidence supporting [Nickelberry's] guilt.

> FN9.  The witness on a bicycle did not testify at trial, but his statement was admitted over [Nickelberry's] objection as a spontaneous statement (Evid. Code, § 1240), a ruling that [Nickelberry] does not challenge on appeal.

The prosecutor argued during rebuttal, without objection: "There are different types of evidentiary systems in the world.  Thousands of years ago when Nomads left Asia and came across Alaska on the Bering Straits and spread down through North America, a lot of these cultures, and not just there, but all over the world, would have Shamans in their small communities that they go to answer their questions.  That's their system of justice.  When they have an issue that needs to be resolved, they don't come to the Superior Court of Solano in front of Judge Moelk to answer those questions.  Although—well, I won't say it.  They had their system of justice, and that included the Shaman in whatever their culture was utilizing what they had as evidence, and they would have trinkets and feathers and carvings and items that were of significance to their cultures.  In some of the communities, what would happen is that Shaman would get down and draw a circle on the ground and drop these items in that circle; and for that particular question, the only items that landed within that circle are items that would be used in coming to a conclusion and settling that dispute, whatever that dispute was.

"Now, [Nickelberry's attorney] is asking you to go outside that circle in making your determination in this case.  Remember what he said, there's no description of the truck given to you directly by somebody.  Well, that doesn't matter.  That's outside the circle because there's competent evidence by the person who had seen that robbery who flagged down [the restaurant customer] and said he got in a gray truck.  *He just took off in a gray truck.  Remember that.  There is no impeachment whatsoever regarding that statement, and that statement is as valid as evidence as* [*the restaurant employee's*] *direct testimony to you today.  All of the evidence that came in there, unless you find somebody lying, is evidence that has value, evidentiary value.  And that guy who saw the robbery and flagged down* [*the customer*] *as he's driving off says he got in a gray truck is competent evidence.*  This argument that there was no description of the truck is, first of all, inconsistent with what the evidence is; but, second of all, asking you to go outside the circle and require something that I'm not required to do.  *A passerby on a bicycle who sees something like this and gives that bit of information may or may not have been at the scene when the cops are there.  It's irrelevant.  What was relevant is what they screamed out when* [*the customer*] *came back* [*to the scene of the robbery*]."  (Italics added.)

b. Analysis

[Nickelberry], who omits the italicized portions of the rebuttal argument quoted above, claims that the prosecutor's argument regarding a "magic circle" (a phrase the prosecutor did not actually use) amounted to misconduct, because it misstated the law and contained facts not in evidence.  He claims that the prosecutor was arguing that he was not required to introduce evidence connecting [Nickelberry's] gray truck to the robbery. To the contrary, a review of the entire argument shows that the prosecutor in fact highlighted the competent evidence that showed the connection, and was simply making the point that he was not required to provide live testimony from the witness who provided a description of [Nickelberry's] truck.

As for the prosecutor's reference to the justice systems of ancient cultures, "'[i]t is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]  It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are *illustrations* drawn from common experience, *history* or literature.' [Citation.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567, italics added.)  We agree with respondent that there is no reasonable likelihood that the jury understood the prosecutor's argument to mean that jurors should use the concept of a circle on the ground as a standard to be used during deliberations.  Again, in light of the fact that the jury was correctly instructed that nothing the attorneys said during closing argument was evidence (CALCRIM No. 222), we reject [Nickelberry's] argument that the prosecutor's statements were grounds to reverse the judgment.

*Nickelberry*, 2012 WL 1427376, at *16-17.

The appellate court's rejection of this prosecutorial misconduct claim also was not unreasonable.  The record reflects, after defense counsel highlighted the fact that the witness who saw the truck did not testify, the prosecutor properly pointed out that he was not required to present the witness in order to prove his case.  Nickelberry cannot show that these challenged comments rendered his trial unfair.  Nickelberry therefore cannot prevail on any of his prosecutorial misconduct claims.

F.     Cumulative Error (Claim 12)

Nickelberry also alleges that cumulative error warrants the reversal of his conviction.

"While the combined effect of multiple errors may violate due process even when no single error

amounts to a constitutional violation or requires reversal, habeas relief is warranted only where

the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011)

(citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)). Such "infection" occurs

where the combined effect of the errors had a "substantial and injurious effect or influence in

determining the jury's verdict." *Brecht*, 507 U.S. at 623(citation omitted). In other words,

where the combined effect of individually harmless errors renders a criminal defense "far less

persuasive than it might [otherwise] have been," the resulting conviction violates due process.

*See Chambers*, 401 U.S. at 294. As discussed above, however, Nickelberry does not allege any

claims that amount to error, and thus he demonstrates no errors that can accumulate to a level of

a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

Nickelberry is therefore not entitled to relief on his cumulative error claim.

G.    Cruel and Unusual Punishment (Claim 13)

    Finally, Nickelberry contends that his sentence of 26 years and 4 months of

imprisonment constitutes cruel and unusual punishment.

    The Eighth Amendment, applicable to the States through the Fourteenth Amendment,

proscribes the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII; *Kennedy*

*v. Louisiana*, 554 U.S. 407, 419 (2008). In determining whether to infer gross

disproportionality, a federal court should examine whether a petitioner's sentence is justified by

the gravity of his triggering offense and his criminal history, a process similar to the three-

pronged approach employed by California state courts. *See Ramirez v. Castro*, 365 F.3d 755,

768 (9th Cir. 2004). While the contours of the "gross disproportionality principle" have been

called "unclear," the principle is applicable only in the "exceedingly rare" and "extreme" case.

*Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003); *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

As an initial matter, because the state appellate court found Nickelberry's cruel and unusual punishment claim forfeited under California's contemporaneous objection rule, the claim is procedurally defaulted from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004). Because the state appellate court held that the claim was forfeited for failure to riase the issue below, Nickelberry's cruel and unusual punishment claim may be deemed procedurally defaulted.

And even if the claim were not procedurally defaulted, Nickelberry would not be entitled to relief on it because he cannot demonstrate that his is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime committed. Nickelberry was convicted of two counts of robbery, possession of a short-barreled shotgun, and possession of a firearm by a felon. His sentence was the result of two felony convictions while using a firearm, following a prior serious felony conviction. As the Court of Appeal noted:

44

[Nickelberry], who had a prior felony conviction and who was on probation at the time of the crime, brandished a shotgun, and used force or fear when taking property from two strangers.  On these facts, [his] sentence is not grossly disproportionate to his culpability.

*Nickelberry*, 2012 WL 1427376, at * 18.

For these reasons, the sentence Nickelberry received is not grossly disproportionate to his crimes.  *See, e.g., Andrade*, 538 U.S. at 72-77 (holding sentence of 50 years to life for $150 petty theft was not cruel and unusual punishment under the gross disproportionality test); *Harmelin v. Michigan*, 501 U.S. 957, 994-95 (1991) (rejecting Eighth Amendment challenge to mandatory life term without possibility of parole for possession of 672 grams of cocaine by defendant who had no prior felony convictions); *see also Plascencia v. Alameida*, 467 F.3d 1190, 1204 (9th Cir. 2006) (holding consecutive 25-year-to-life sentence for gun enhancement for using a firearm in the commission of a murder was not cruel and unusual punishment).  Accordingly, his cruel and unusual punishment claim does not merit federal habeas relief.

## V. CONCLUSION AND ORDER

Nickelberry is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: February 5, 2015.

    /s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge
